

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 12, 2007

<u>By Hand and ECF</u>

The Honorable Harold Baer
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street, 2230
New York, NY  10007

> Re:  **<u>United States v. Rodriguez et al.</u>,**
>      **S1 07 Cr. 699 (HB)**

Dear Judge Baer:

        The Government respectfully submits this letter-brief in opposition to defendants Bryant De Los Santos, Demi Abriham, and Pedro Cabrera's motions to suppress post-arrest statements and physical evidence recovered by member of the Joint Firearms Task Force ("JTFT"), and to dismiss the indictment based upon "outrageous" government conduct, in connection with the defendants' arrest on June 27, 2007, for conspiracy to commit robbery and conspiracy to possess with intent to distribute cocaine.  As discussed below, all of the motions filed by the defendants are without merit, and should be denied.  A hearing is scheduled for November 19, 2007, at 10:00 a.m.

<b>BACKGROUND</b>

        The defendants are charged in a two Count Indictment with conspiracy to commit a robbery, and with conspiracy to possess with intent to distribute cocaine, in violation of Title 18, United States Code, Section 1951, and Title 21, United States Code, Section 846.  (A copy of the Superseding Indictment is attached as Exhibit A).

        As alleged in the Complaint, in early June 2007, a confidential informant ("CI"), who had provided reliable information to law enforcement in the past, told law enforcement about a group of individuals who he had committed robberies with in the past. (<u>See</u> Compl. ¶ 3), a copy of the Complaint is attached as Exhibit B.)  According to the CI, he knew one of the individuals as "Flaco," later identified as Lorenzo Rodriguez, a/k/a "Flaco," one of the defendants in this case.  "Flaco," according to the CI, was the organizer of the group, and was able

The Honorable Harold Baer
November 12, 2007
Page 2

to recruit other individuals to assist in robberies.  (<u>Id.</u> ¶ 3.)
Thereafter, the CI made several consensually monitored and
recorded telephone calls to "Flaco" discussing setting up a
robbery of a drug dealer who purportedly would have approximately
25 kilograms of cocaine.  (<u>Id.</u> ¶¶ 4, 5.)  Eventually, an
undercover ("UC") special agent with the Bureau of Alcohol,
Tobacco, Firearms, and Explosives ("ATF"), was introduced to
"Flaco" over the telephone by the CI.  (<u>Id.</u> ¶ 5.)  The CI told
"Flaco" that the UC would fly to New York from Puerto Rico to
provide information on where several kilograms of cocaine would
be delivered.  The UC also contacted "Flaco" on several
occasions, and eventually told "Flaco" that he was coming to New
York.  (<u>Id.</u>)

        On or about June 25, 2007, the CI and the UC contacted
"Flaco" and arranged to meet at a hotel the following day.  (<u>Id.</u>
¶ 6.)  On June 26, 2007, at approximately 2:00 p.m., the UC
contacted "Flaco," and told him that he was staying at a hotel
near JFK airport.  During the course of this conversation, the UC
told "Flaco" to bring all of the people who were going to be part
of the robbery.  The UC told "Flaco" that he wanted to meet them
to make sure they knew who he was.  (<u>Id.</u> ¶ 6.)  Later that day,
at approximately 5:00 p.m., Rodriguez and Jose Cirrasquillo,
a/k/a "Tio," came to the hotel room to meet with the UC.  (<u>Id.</u> ¶
7.)  This meeting was recorded using audio and video equipment,
JFTF members monitored the meeting in a hotel room next door to
where the meeting took place.  (<u>Id.</u> ¶ 7.)

        At this meeting, the UC told Rodriguez and Cirrasquillo
that he worked for a company that transported cocaine for a group
of Colombians.  (<u>Id.</u> ¶ 8.)  The UC also told Rodriguez and
Cirrasquillo that his organization was upset with the Colombians
because they were not getting paid.  (<u>Id.</u> ¶ 8.)  This, according
to the UC, was why the UC wanted to steal the cocaine.  The UC
asked Rodriguez and Cirrasquillo if this job was too big for
them, and they said that it was not.  (<u>Id.</u> ¶ 8.)  The UC told
Rodriguez and Cirrasquillo that he picks up between 25 and 30
kilograms of cocaine every few months in New York for this
organization.  The defendants asked the UC what he typically does
with the cocaine after he picks it up.  The UC informed the
defendants that he drives the cocaine to Miami, Florida.  (<u>Id.</u> ¶
8.)  The UC told Rodriguez and Cirrasquillo that he picks up the
cocaine from a location in the Bronx.  The UC told them that he
would not learn the location of the house until the following
morning.  (<u>Id.</u> ¶ 8.)  The UC told Rodriguez and Cirrasquillo that
the way the organization operates is that if he leaves the
location with the cocaine, then he is responsible for it.  (<u>Id.</u> ¶
8.)  Therefore, the robbery had to take place at the location
where the drugs were stored.  The UC told Rodriguez and
Cirrasquillo that there would be three individuals inside the

The Honorable Harold Baer
November 12, 2007
Page 3

house, and that at least one of the individuals would be armed. (<u>Id.</u> ¶ 8.)

Rodriguez and Cirrasquillo discussed how the robbery would take place.  The defendants told the UC that they would enter the location, order everyone to the ground, and tie up everyone.  (<u>Id.</u> ¶ 8.)  They also told the UC that they would tie him up as well, so that it did not look suspicious.  In addition, Cirrasquillo told the UC that he would take the UC's chain and watch to protect the UC.  When describing the way they would enter the house, Cirrasquillo made a motion with his hands appearing to be carrying a firearm.  (<u>Id.</u> ¶ 8.)  Rodriguez and Cirrasquillo also asked the UC about the neighborhood where the robbery would take place.  (<u>Id.</u> ¶ 8.)

The UC asked Rodriguez and Cirrasquillo how many other individuals were going to participate in the robbery. Cirrasquillo responded that he was going to recruit several other individuals to participate in the robbery with them.  (<u>Id.</u> ¶ 8.)

The UC discussed with Rodriguez and Cirrasquilla how they would divide the proceeds of the robbery.  They agreed that the UC would get 10 kilograms of cocaine, and the other participants would receive the rest.  (<u>Id.</u> ¶ 8.)  They agreed that if there was more than 30 kilograms of cocaine, they would further negotiate a different split.  The UC told Rodriguez and Cirrasquillo to have everyone available the following day by 12:00 p.m., and told them that he would call Rodriguez at approximately 2:00 p.m. and tell them where to meet in the Bronx. (<u>Id.</u> ¶ 8.)  The UC told the defendants that he would receive a telephone call at approximately 3:00 p.m. with the location of the cocaine.  (<u>Id.</u> ¶ 8.)  He also told them that, prior to doing the robbery, he was going to provide them with a van for them to use during the robbery.  (<u>Id.</u> ¶ 8.)  The UC told Rodriguez and Cirrasquillo that they should return the van, with his share of the cocaine, to the same location after the robbery.  (<u>Id.</u> ¶ 8.)

Following the meeting at the hotel on June 26, 2007, Rodriguez called the UC at approximately 9:30 p.m.  This telephone call was recorded.  (<u>Id.</u> ¶ 9.)  During the course of this conversation, Rodriguez told the UC that he had discussed the plan with his people, and that there was a "small problem." (<u>See</u> Exhibit C, a transcript of this conversation.)  According to Rodriguez, his "guys" were not happy with the proposed split of cocaine.  (<u>Id.</u>)  Rodriguez told the UC that "because at least five or six of us have to come along," the UC should not get ten kilograms of cocaine.  (<u>Id.</u>)

The following day, on June 27, 2007, at approximately 1:00 p.m., Rodriguez called the UC and told him that he had all

The Honorable Harold Baer
November 12, 2007
Page 4

of his people ready to go.  (See Ex. B, ¶ 9.)  The UC told
Rodriguez that he would call them later that day when he was in
the Bronx.  At approximately 2:30 p.m., the UC contacted
Rodriguez and told him to meet him at a gas station in the Bronx.
(Id. ¶ 9.)  The UC gave the address of the gas station to
Rodriguez.  Approximately fifteen minutes later, Rodriguez
arrived at the gas station on foot.  The UC asked where the rest
of the group was, and Rodriguez stated that they were driving
around, and that they would not agree to meet the UC.  (Id. ¶ 9.)
The UC told Rodriguez that he had to meet the other individuals
who were going to do the robbery, so they could see what the UC
looked like.  (Id. ¶ 9.)  After discussing this for approximately
fifteen minutes, Rodriguez said the he did not want to do the
robbery.  (Id. ¶ 9.)

        Thereafter, the CI placed a telephone call to Rodriguez
to reassure him that the UC could be trusted.  Following that
conversation, Rodriguez called the UC and told him that he, and
the other individuals, would come to the gas station
approximately five minutes later.  (Id. ¶ 10.)

        Approximately fifteen minutes later, Rodriguez arrived
back at the gas station on foot.  (Id. ¶ 11.)  Rodriguez got into
the car with the UC, and told the UC that they were ready to go
pick up his people.  (Id. ¶ 11.)  The UC drove Rodriguez
approximately one or two blocks, and then Rodriguez got out of
the car, and into a vehicle driven by Cirrasquillo.  Cirrasquillo
thereafter pulled his vehicle over to the side of the road, and
instructed the UC to wait.  Approximately two minutes later,
Cirrasquillo pulled into the street, and the UC observed a Range
Rover pull in behind him.  (Id. ¶ 11.)  The UC proceeded to a
pre-determined location inside a storage facility, and was
followed by the vehicle driven by Cirrasquillo and the Range
Rover.

        When the UC arrived at the storage facility, the two
vehicles parked outside the facility.  (Id. ¶ 12.)  Eventually,
the UC drove his car back outside the storage facility, and
picked up Rodriguez, and drove him to storage unit where the van
was stored.  (Id. ¶ 12.)  Cirrasquillo, as well as the
individuals in the Range Rover, one of whom was Bryant De Los
Santos, remained outside the storage facility.  (Id. ¶ 12.)
Thereafter, the defendants were arrested.

The Honorable Harold Baer
November 12, 2007
Page 5

## DISCUSSION

### I. Applicable Law

#### A.    Motion to Dismiss Based On Government Conduct

A motion to dismiss an indictment based on "outrageous" government conduct turns on "whether the governmental conduct, standing alone, is so offensive that it shocks the conscience." United States v. Chin, 934 F.2d 393, 398 (2d Cir. 1991) (citations omitted); see also United States v. Williams, 372 F.3d 96, 111, 112 (2d Cir. 2004); United States v. Cuervelo, 949 F.2d 559, 565 (2d Cir 1991) ("In federal court, if the government violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a conviction," if the government's conduct "reach[ed] a demonstrable level of outrageousness.") (citation omitted; alteration in original). Although certain government conduct could be "so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction," such a finding is rare. United Stats v. Berkovich, 168 F.3d 64, 68-69 (2d Cir. 1999) (quoting United States v. Schmidt, 105 F.3d 82, 91 (2d Cir. 1997) (internal quotations and citations omitted)); see also United States v. LaPorta, 46 F.3d 152, 160 (2d Cir. 1994) (finding only one case where a circuit court has found such conduct since 1976). In the Second Circuit, "the defense of outrageous governmental conduct 'in the rare instances when successful, has prevailed to restrain law enforcement activities that involve coercion or outrageous violation of physical integrity.'" United States v. Collins, 755 F. Supp. 110, 111, (S.D.N.Y. 1991) (quoting United States v. Myers, 692 F.2d 823, 837 (2d Cir. 1982) (citations omitted)).

The Second Circuit has routinely found that when government agents conduct a sting operation, it does not violate a defendant's due process rights. Berkovich, 168 F.3d at 69 (holding that when Government conduct does "no more than facilitate a criminal enterprise . . . due process principles are not violated") (quoting Schmidt, 105 F.3d at 92); Schmidt, 105 F.3d at 91 (noting that outrageous conduct ordinarily must involve either coercion or a violation of the defendant's person); United States v. Asencio, 873 F.2d 639, 641 (2d Cir. 1989); United States v. Romano, 706 F.2d 370 (2d Cir. 1983); United States v. Carpentier, 689 F.2d 21, 27 (2d Cir. 1982) (approving government sting operation); Myers, 692 F.2d 823, 837 (2d Cir. 1982) (government's involvement in sting operation did not violate due process); United States v. Nunez-Rios, 622 F.2d 1093 (2d Cir. 1980) (same); United States v. Corcione, 592 F.2d 111, 114-15 (2d Cir. 1979) (reviewing Supreme Court precedents

The Honorable Harold Baer
November 12, 2007
Page 6

and concluding that law enforcement's extensive involvement in
operation does not constitute outrageous Government conduct).

### B.   Probable Cause to Arrest

A warrantless arrest such as the one in this case is
fully justified if there is "probable cause when the defendant is
put under arrest to believe that an offense has been or is being
committed." United States v. Cruz, 834 F.2d 47, 50 (2d Cir.
1987).  Probable cause exists "if the law enforcement official,
on the basis of the totality of the circumstances, has sufficient
knowledge or reasonably trustworthy information to justify a
person of reasonable caution in believing that an offense has
been or is being committed by the person to be arrested." United
States v. Patrick, 899 F.2d 169, 171 (2d Cir. 1990) (citing,
inter alia, Brinegar v. United States, 338 U.S. 160, 175-76
(1949) and Illinois v. Gates, 462 U.S. 213, 230-32 (1983)).

Probable cause is a "commonsense, nontechnical" concept
that is determined by "the factual and practical considerations
of everyday life on which reasonable and prudent men, not legal
technicians, act." Ornelas v. United States, 517 U.S. 690, 695
(1996) (quotation omitted).  As the Supreme Court explained in
Illinois v. Gates:

> The process [of determining probable cause]
> does not deal with hard certainties, but with
> probabilities. Long before the law of
> probabilities was articulated as such,
> practical people formulated certain
> common-sense conclusions about human
> behavior; jurors as factfinders are permitted
> to do the same — and so are law enforcement
> officers. Finally, the evidence thus
> collected must be seen and weighed not in
> terms of library analysis by scholars, but as
> understood by those versed in the field of
> law enforcement.

462 U.S. at 231-32 (quotation omitted). As a result, "it is clear
that only the probability, and not a prima facie showing, of
criminal activity is the standard of probable cause." Id. at 235
(quotation omitted); see also Maryland v. Pringle, 540 U.S. 366,
370 (2003) ("The probable cause standard is incapable of precise
definition or quantification into percentages because it deals
with probabilities . . . . We have stated . . . that [t]he
substance of all the definitions of probable cause is a
reasonable ground for belief of guilt.") (internal quotation
marks and citations omitted); Hill v. California, 401 U.S. 797,
804 (1971) ("[S]ufficient probability, not certainty, is the
touchstone of reasonableness under the Fourth Amendment.");

The Honorable Harold Baer
November 12, 2007
Page 7

United States v. Cruz, 834 F.2d at 50 (to establish probable
cause, "it is not necessary to make a prima facie showing of
criminal activity or to demonstrate that it is more probable than
not that a crime has been or is being committed") (quotation
omitted).

        The presence or absence of probable cause must be
determined from the totality of the circumstances.  See Gates,
462 U.S. at 238. That determination is inherently fact-specific,
and does not lend itself to the formulation or application of
specific rules or tests.  Thus, this Court has explained that
"[p]robable cause is a flexible term. There is no rigid demand
that specific tests be satisfied." Tenenbaum v. Williams, 193
F.3d 581, 603 (2d Cir. 1999) (quotations omitted).  Moreover, the
information known to the officers at the time need not appear
sufficient to support a conviction, or even be admissible in
court.   See Adams v. Williams, 407 U.S. 143, 149 (1972)
("Probable cause does not require the same type of specific
evidence of each element of the offense as would be needed to
support a conviction. Rather, the court will evaluate generally
the circumstances at the time of the arrest to decide if the
officer had probable cause for his action.").

        Moreover, "[p]robable cause issues are to be decided on
an objective basis by courts without regard to the subjective
beliefs of law enforcement officers, whatever those beliefs may
have been." Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir.
1997) (en banc); see also United States v. Scopo, 19 F.3d 777,
783-85 (2d Cir. 1994) (analysis of Fourth Amendment issues
involves "an objective assessment of the officer's actions in
light of the facts and circumstances confronting him at the time
and not on the officer's actual state of mind at the time the
challenged action was taken.") (citations omitted); United States
v. Ochs, 595 F.2d 1247, 1256 (2d Cir. 1979) ("[T]he test is what
could lawfully be done, not what the policemen thought the source
of their power to be.").  Thus, as this Court explained in Scopo,
so long as the arresting officer had probable cause to believe an
offense was being committed, and "was authorized by state or
municipal law to effect a custodial arrest for the particular
offense, the resulting arrest will not violate the fourth
amendment." United States v. Scopo, 19 F.3d at 784.

## C.   Legal Standards for Knowingly Waiving Miranda Warnings

        Miranda warnings are required prior to police
interrogation "after a person has been taken into custody or
otherwise deprived of his freedom of action in any significant
way." Miranda v. Arizona, 384 U.S. 436, 444 (1966).  Statements
made by a defendant after the administration of Miranda warnings
are admissible, if the defendant knowingly and voluntarily waives

The Honorable Harold Baer
November 12, 2007
Page 8

his rights. <u>See</u> <u>United States v. Jaswal</u>, 47 F.3d 539, 542 (2d Cir. 1995) (<u>per curiam</u>). "To prove a valid waiver [of <u>Miranda</u> warnings], the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." <u>Jaswal</u>, 47 F.3d at 542. "Only if the totality of the circumstances 'reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.' " <u>United States v. Male Juvenile</u>, 121 F.3d 34, 41 (2d Cir. 1997) (quoting authority omitted). "A voluntary relinquishment of a right occurs when the relinquishment is the 'product of a free and deliberate choice rather than intimidation, coercion, or deception." <u>Male Juvenile</u>, 121 F.3d at 41 (quoting authority omitted).

       A similar "totality of the circumstances" approach is required in the context of an alleged language barrier. <u>See, e.g.</u>, <u>Jaswal</u>, 47 F.3d at 542; <u>Campaneria v. Reid</u>, 891 F.2d 1014, 1020 (2d Cir. 1989) ("Even though his proficiency in the English language may have been limited, it did not prevent him from making a knowing and intelligent waiver of his constitutional rights."); <u>United States v. Todisco</u>, 667 F.2d 255, 260 (2d Cir. 1981) (affirming the district court's rejection of a claim by the defendant that he did not understand English based on the defendant's conduct during the investigation and in-court); <u>United Stats v. Diallo</u>, 2006 WL 3373173, at *1 (2d Cir. Nov. 21, 2006) (unpublished opinion) (same); <u>United States v. Bing-Gong</u>, 594 F. Supp. 248, 256-57 (N.D.N.Y. 1984), <u>aff'd sub nom.</u>, 788 F.2d 4 (2d Cir. 1986).

## II. Application

### A. Cabrera and Abriham's Joint Motion to Dismiss the Indictment Should Be Denied

       Defendants Cabrera and Abriham move to dismiss the indictment based on alleged "outrageous" conduct by the Government because "the crimes alleged against the defendants were manufactured solely by the government, from start to finish." (Defs.' Mot. ¶¶ 1, 2.)  For the reasons that follow, the motion should be denied.

       The premise of the defendants' motion is that this crime was "manufactured" by the Government.  This is false.  As alleged in the Complaint, a confidential informant told the government about a group of individuals he had committed robberies with in the past. (Compl. ¶ 3.)  He knew Lorenzo Rodriguez, a/k/a "Flaco," to be one of the organizers of this group, who was also able to recruit other individuals to assist

The Honorable Harold Baer
November 12, 2007
Page 9

in robberies.  (Id. ¶ 3.)  Thereafter, a series of consensually
recorded and monitored telephone calls were made between the CI,
and undercover, and defendant Rodriguez.  In those calls,
Rodriguez, the CI, and the undercover discuss a robbery.
Eventually, the Undercover meets at a hotel with Rodriguez and
defendant Jose Cirrasquillo, a/k/a "Tio," to further discuss the
robbery.  (Id. ¶¶ 7, 8.)  During this time, Rodriguez and
Cirrasquillo actively discuss the robbery with the UC, discuss
how they have been involved in robberies in the past, and the
procedure that they would use for this robbery.  This included
bringing others to assist them in the robbery.  (Id.)  This
conduct by law enforcement is not "so extensive and outrageous"
"that due process would prohibit conviction of the defendants."
Corcione, 592 F.2d at 115.

        Indeed, the Supreme Court has found no due process
violations where the Government supplied "an essential and
scarce" chemical necessary for the manufacture of
methamphetamine, United States v. Russell, 411 U.S. 423, 431-32
(1973), as well as where the Government supplied heroin (from an
informant) to the defendant for sale to an agent, Hampton v.
United States, 425 U.S. 484, 488-90 (1976).  The Second Circuit
has also consistently found no due process violation in cases
where the Government involvement is much greater than here.  See,
e.g., Berkovich, 168 F.3d at 69 (Government opened a bank account
for the defendant to deposit fraudulent funds); Schmidt, 105 F.3d
at 92 ("We recognize the government's involvement in Schmidt's
plan was extensive.  Inspector Cuff posed as a hit man and talked
with Schmidt in that capacity and federal agents actually
conducted a controlled breakout from Rikers Island."); Corcione,
592 F.2d at 114 (no due process violation where "Government
informant not only bought and took delivery of the heroin in
Bangkok but purchased the identical suitcases with the secret
compartments and stuffed the heroin into one of the suitcases, a
DEA agent transported that suitcase containing all of the heroin
into the United States, the DEA refilled the secret compartment
of that suitcase with the soap powder plus a small amount of the
same heroin, the DEA switched the suitcases at Kennedy Airport,
putting the suitcase containing a small amount of the heroin into
the informant's possession, and the informant brought this
suitcase through customs, turning it over later to the
defendant").  Further, defendants' Cabrera and Abriham have
failed to show how the Government's conduct as it involves them
is "outrageous."  Cabrera and Abriham were expecting to rob a
drug dealer of 25 kilograms of cocaine.  The fact that there were
no drugs to rob does not constitute outrageous Government
conduct.  Indeed, the defendants could have said "no" at anytime.
See United States v. Myers, 635 F.2d 932, 939 (2d Cir. 1980)
("Any Member of Congress approached by agents conducting a
bribery sting operation can simply say 'No.'").

The Honorable Harold Baer
November 12, 2007
Page 10

        The cases cited by the defendants do not require a
different result.  As a preliminary matter, the defendants fail
to cite to a single Second Circuit case, much less one where the
Court found "outrageous" Government conduct requiring dismissal
of an indictment.  Further, the cases cited by defendants, mostly
from the 1970s and early 1980s, are inapposite.  In each of these
cases, the Government's involvement was much more problematic
than the facts in this case.  (See Defs.' Br. at 2 - 6.)  For
example, defendants point to United States v. Lard, 734 F.2d 1290
(8th Cir. 1984), in support of their position.  In Lard, a
Government agent assisted the defendant in making a pipe bomb,
even though the defendant has shown a disinterest in the crime.
734 F.2d at 1297.  Obviously, the defendants in this case did not
show any disinterest in this crime.  In addition, in State v.
Hohensee, 650 S.W.2d 268 (1982), the state court found
problematic the fact that law enforcement actually participated
in a robbery.  Again, these facts are much different than the
facts at issue in this case.  In this case, there was no drug
dealer to rob, and law enforcement made sure that innocent
individuals would not be harmed.[1]  In sum, the cases cited by the
defendants in support of their position actually do the opposite.
These cases are examples of Government action that is much more
involved than the facts of this case.  Here, the defendants were
part of a robbery crew that were showing up to do their job –
commit a robbery.  They cannot claim "outrageous" Government
conduct simply because there was no victim.

        For these reasons, the defendants' motion should be
denied.

## B.    De Los Santos' Motion Should Be Denied Without a
        Hearing

        The affirmation submitted by De Los Santos' attorney in
support of his motion (the "Aidala Affirmation") seeks
suppression of the defendant's post-arrest statements, as well as
any physical evidence taken from the defendant in connection with
his arrest.  The Aidala Affirmation asserts that the "sole basis
for arresting [De Los Santos] was his presence in the vehicle
near the location where the two co-defendants, [Rodriguez and
Cirrasquillo], had arranged to meet the UC."  (Aidala Aff. At 2.)

_____

        [1] Further, the procedural posture of these cases are different
than the motion the Court is considering in this case.  These cases
were decided after trial.  See United States v. Lard, 734 F.2d 1290
(8th Cir. 1984) (defendants convicted after trial); United States v.
Twigg, 588 F.2d 373 (3d Cir. 1978) (same); United States v. West, 511
F.2d 1083 (3d Cir. 1975) (same); State v. Hohensee, 650 S.W.2d 268
(Mo. 1982) (same).

The Honorable Harold Baer
November 12, 2007
Page 11

        This conclusory assertion in the Aidala Affirmation
ignores much of the facts in the complaint, including, <u>inter</u>
<u>alia</u>, (1) the fact that law enforcement expected 4 or 5 other
individuals to come with Rodriguez and Cirrasquillo to the
robbery, (2) that Rodriguez told the UC the night before at the
hotel that he was going to be bringing other guys with him, (3)
that Rodriguez had contacted the UC on the telephone the night
before and told him that five or six individuals would be present
at the robbery. (<u>See</u> Ex. B, ¶¶ 8, 9, Ex. C.)  Even more
significantly, it also ignores the fact that the Range Rover the
defendant was riding in followed the UC, Rodriguez, and
Cirrasquillo for several blocks, for several turns, to the
storage facility where the group was going to meet to do the
robbery.  This is not, as the Aidala Affirmation claims, a case
where the defendant was arrested for being in the wrong place at
the wrong time.  <u>See</u> <u>Patrick</u>, 899 F.2d at 171  Rather, there were
several important and relevant facts that gave law enforcement
probable cause to believe that De Los Santos was part of the
conspiracy to rob the drug dealer.

        Law enforcement knew, based on the investigation up to
that point, that between five and six individuals were going to
meet at the storage facility to go do the robbery.  Law
enforcement knew, based on conversations between the UC and
Rodriguez, that he had gotten five or six "guys" to help with the
robbery.  (<u>See</u> Ex. C.)  Then, the day of the take down, after
Rodriguez and Cirrasquillo were ready to go to do the robbery,
they instructed the UC to wait on the side of the road.  Then,
approximately two minutes later, Cirrasquillo pulled into
traffic, followed by the Range Rover that the defendant was
riding in.  Thereafter, the Range Rover followed the UC and
Cirrasquillo for several blocks, until they stopped at the pre-
determined meeting location – a storage facility in the Bronx.
Thus, the defendant was not arrested merely based upon his
presence at the take down.  These facts establish probable cause.
<u>See</u> <u>Ornelas</u>, 517 U.S. at 695; <u>United States v. Barlin</u>, 686 F.2d
81, 87 (2d Cir. 1982) (probable cause exists even though agents
unfamiliar with individual arrested due to all of the
circumstances of the investigation to that point); <u>Scopo</u>, 19 F.3d
at 784.

        In <u>United States v. Munoz</u>, 738 F. Supp. 800 (S.D.N.Y.
1990), the court considered whether probable cause existed to
arrest a passenger sitting in a jeep with a suspected kidnapper.
<u>Munoz</u>, 738 F. Supp. at 802 (cited with approval in <u>United States</u>
<u>v. Tehrani</u>, 686 F.2d 54, 60 (2d Cir. 1995)).  The court found
probable cause existed, noting that the agents' observations and
knowledge about the case "constituted probable cause for
believing that [the defendant] 'was not just a mere innocent
traveling companion but was traveling and acting in concert'" in
the kidnaping.  <u>Id.</u> (quoting <u>Patrick</u>, 899 F.2d at 172).  The

The Honorable Harold Baer
November 12, 2007
Page 12

court continued, finding that the agents were aware that several
individuals were probably involved in the kidnaping, and that it
was logical for agents to suspect several members of the
kidnaping team to be present due, in part, to the fact that the
kidnapers had threatened violence.  Id.  The court found that, by
the time the defendant was placed under arrest, he "was no longer
just a bystander in the eyes of the objective 'person of
reasonable caution.'"  Id.  The facts of this case are similar.
At the time of his arrest, law enforcement had not just observed
De Los Santos sitting in the Range Rover.  Law enforcement knew
that several individuals would be present at the storage facility
to participate in the robbery.  De Los Santos had been in a car
that had followed the UC and Cirrasquillo for several blocks,
exactly as Rodriguez had told the UC it would happen.  These
facts give rise to probable cause.  See also Cruz, 834 F.2d at
50.

        The cases cited in the Aidala Affirmation do not
require a different result.  (See Aidala Affirmation at 3 - 6.)
These cases stand for the unremarkable proposition that mere
presence at the scene of a crime is not enough to establish
probable cause.  These cases stand for the proposition that "a
person's mere propinquity to others independently suspected of
criminal activity does not, without more, give rise to probable
cause to search that person."  Patrick, 899 F.2d at 171 (citing
Ybarra v. Illinois, 444 U.S. 85, 91 (1978)) (emphasis in
original).  The Government does not assert anything different.
As discussed above, De Los Santos was not arrested for being in
the same vicinity as Rodriguez and Cirrasquillo.  Probable cause
to arrest De Los Santos existed because law enforcement believed
that a crime had been committed because he was part of the
robbery crew that was traveling to the storage facility so they
could commit a robbery.  See Cruz 834 F.2d at 50.

        Finally, the Court does not need to conduct an
evidentiary hearing to decide this motion.  It is well-settled
that a defendant who moves to suppress evidence is not entitled
to an evidentiary hearing unless he supports his motion with
"moving papers [that] are sufficiently definite, specific,
detailed, and nonconjectural to enable the court to conclude that
contested issues of fact going to the validity of the search are
in question."  United States v. Pena, 961 F.2d 333, 339 (2d Cir.
1992); see also United States v. Jailall, No. 00 Cr. 069, 2000 WL
1368055, at * 8 (S.D.N.Y. Sept. 20, 2000) ("defendant must show
that disputed issues of material fact exist that require an
evidentiary hearing."); United States v. Viscioso, 711 F. Supp.
740, 745 (S.D.N.Y. 1989) (defendant only has right to a
suppression hearing when disputed issues of material fact are
shown).  Here, the defendant submitted an affidavit claiming that
"he was in the rear seat of a vehicle in which three other
persons were present," that later he "was placed under arrest."

The Honorable Harold Baer
November 12, 2007
Page 13

(De Los Santos Aff. Pg. 1).  De Los Santos continues by claiming
that he was separated from the other individuals who were
arrested, that he was questioned at length by the police, "given
a written waiver" of his rights which he signed. (Id.).  Indeed,
nothing in his statement indicates law enforcement's conduct
during the course of his interview violated any of the
defendant's rights.  Hence, there are no contested issues of
fact, De Los Santos only contends that the facts, as alleged, do
not give rise to probable cause.  Therefore, he is not entitled
to an evidentiary hearing.[2]

   **B.   The Government Respectfully Requests That the Court
         Conduct a Hearing With Respect to Demi Abriham's Motion
         to Suppress His Post Arrest Statement**

         Demi Abriham submitted an affidavit claiming that he
was asked questions by the police prior to signing a waiver of
rights form.  Therefore, the Government respectfully requests
that the Court conduct a hearing, at which the Government expects
to call, among other witnesses, the officers who were present
during the questioning of Abriham, who will testify about the
circumstances surrounding the defendant's post-arrest statement.

---

   [2] The motion also asks the Government to provide Brady and Giglio
material.  As the Government has already informed the defendant, the
Government recognizes its obligations under Brady v. Maryland, 373
U.S. 83 (1963), and its progeny.  To date, the Government is unaware
of any Brady material regarding the defendant, but will provide timely
disclosure if any such material comes to light.  The Government will
provide material under Giglio v. United States, 405 U.S. 150, 154
(1972), and its progeny, in a timely manner.  The motion also seeks to
preclude the Government from introducing evidence pursuant to Fed. R.
Evid. 404(b).  The Government has not provided notice that it intends
to introduce such evidence.  To the extent the Government does intend
to introduce 404(b) evidence, it will provide appropriate notice in a
timely manner.

The Honorable Harold Baer
November 12, 2007
Page 14

## CONCLUSION

Based on the foregoing, the Government submits De Los
Santos' motion should be denied without a hearing, that
defendants Cabrera and Abriham's motion to dismiss the indictment
should be denied without a hearing, and that the Court conduct an
evidentiary hearing with respect to Abriham's motion to suppress
his post-arrest statement.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:     _Todd Blanche_____
Todd Blanche
Assistant United States Attorney
(212) 637-2494


cc:     Ira D. London, Esq.
Attorney for Defendant Lorenzo Rodriguez
(212) 683-9422 (facsimile)

Ellyn I. Bank, Esq.
Attorney for Defendant Jose Cirrasquillo
(212) 962 9696 (facsimile)

David Segal, Esq.
Attorney for Defendant Demi Abriham
(212)-571-0938 (facsimile)

Louis R. Aidala, Esq.
Attorney for Defendant Bryant De Los Santos
(212) 750-8297 (facsimile)

Robert Blossner, Esq.
Attorney for Defendant Pedro Cabrera
(212)571-0938

# Exhibit A

07 MAG 1054

Approved: _____
                TODD BLANCHE
                Assistant United States Attorney

Before:    THE HONORABLE GABRIEL W. GORENSTEIN
                United States Magistrate Judge
                Southern District of New York

- - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                :        COMPLAINT

            - v -                                :        Violation of
                                                            18 U.S.C. §§ 1951,
JUAN HERRERA,                            :        and 2
    a/k/a "Flaco,"
    a/k/a "Santos Rodriguez,"    :
JOSE CIRRASQUILLO,
    a/k/a "Tio,"                            :        COUNTY OF OFFENSE:
DEMI ABRIHAM,                            BRONX
    a/k/a "300,"                          :
BRYANT DE LOS SANTOS,
                                                    :
            Defendants.
                                                    :
- - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

            PETER SHANHAI, being sworn, deposes and says that he is
a Detective with the New York City Police Department ("NYPD"),
and charges as follows:

COUNT ONE

            1.      From in or about June 7, 2007, up to and
including June 27, 2007, in the Southern District of New York,
JUAN HERRERA, a/k/a "Flaco," a/k/a "Santos Rodriguez," JOSE
CIRRASQUILLO, a/k/a "Tio," DEMI ABRIHAM, a/k/a "300," BRYANT DE
LOS SANTOS, the defendants, and others known and unknown,
unlawfully, willfully and knowingly, conspired to commit robbery,
as that term is defined in Title 18, United States Code, Section
1951(b)(1), to wit, the defendants, and others known and unknown,
conspired to rob a cocaine dealer of approximately 25 kilograms
of cocaine in the Bronx, and would thereby have obstructed,
delayed and affected commerce and the movement of articles and
commodities in commerce, as that term is defined in Title 18,
United States Code, Section 1951(b)(3).

            (Title 18, United States Code, Sections 1951 and 2.)

      The bases for my knowledge and the foregoing charge are, in part, as follows:

      2.    I am a Detective with the NYPD, assigned to the ATF/NYPD Joint Firearms Taskforce, and I have been personally involved in the investigation of this matter. This affidavit is based upon my conversations with other law-enforcement agents, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

      3.    In early June 2007, a confidential informant ("CI") told law enforcement about a group of individuals who he had committed robberies with in the past. According to the CI, he knew one of the individuals as "Flaco," later identified as JUAN HERRERA, a/k/a "Flaco," a/k/a "Santos Rodriguez," the defendant.1 "Flaco," according to the CI, was the organizer of the group, and was able to recruit other individuals to assist in robberies.

      4.    On or about June 7, 2007, the CI made a consensually monitored and recorded telephone call to "Flaco" to discuss setting up a robbery. During the course of that conversation, the CI told "Flaco" that he knew an individual who knew where a large quantity of cocaine was kept. The CI and "Flaco" discussed, among other things, arranging to do the "job" at a later date.

      5.    Over the course of the next several weeks, the CI contacted "Flaco" on the telephone on several occasions. Each of these telephone calls were consensually monitored and recorded by law enforcement. During the course of these conversations, the CI and "Flaco" continued to discuss stealing the cocaine. In addition, during two of these telephone calls, an undercover ("UC") special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), was introduced to "Flaco" over the telephone by the CI. The CI told "Flaco" that the UC would fly to New York from Puerto Rico to provide information on where several kilograms of cocaine would be delivered. The UC also contacted "Flaco" on several occasions, and eventually told "Flaco" that he was coming to New York.

---

1 Information previously given by the CI has been corroborated by law enforcement and deemed reliable.

6.    On or about June 25, 2007, the CI and the UC contacted "Flaco" and arranged to meet at a hotel the following day.  On June 26, 2007, at approximately 2:00 p.m., the UC contacted "Flaco," and told him that he was staying at a hotel near JFK airport.  During the course of this conversation, the UC told "Flaco" to bring all of the people who were going to be part of the robbery.  The UC told "Flaco" that he wanted to meet them to make sure they knew who he was.

7.    At approximately 5:00 p.m. on June 26, 2007, JUAN HERRERA, a/k/a "Flaco," a/k/a "Santos Rodriguez," and JOSE CIRRASQUILLO, a/k/a "Tio," the defendants, came to the hotel room to meet with the UC.  This meeting was recorded using audio and video equipment.  I was simultaneously monitoring this meeting in a room next door to where the meeting took place.  In addition, following the meeting, I debriefed the UC about the meeting. Based on the monitoring, and my debriefing of the UC, I have learned the following:

a.    The UC told HERRERA and CIRRASQUILLO that he worked for a company that transported cocaine for a group of Colombians.  The UC told HERRERA and CIRRASQUILLO that his organization was upset with the Colombians because they were not getting paid.  This, according to the UC, was why the UC wanted to steal the cocaine.  The UC asked HERRERA and CIRRASQUILLO if this job was too big for them, and they said that it was not.

b.    The UC told HERRERA and CIRRASQUILLO that he picks up between 25 and 30 kilograms of cocaine every few months in New York for this organization.  HERRERA and CIRRASQUILLO asked the UC what he typically does with the cocaine after he picks it up.  The UC informed the defendants that he drives the cocaine to Miami, Florida.

c.    The UC told HERRERA and CIRRASQUILLO that he picks up the cocaine from a location in the Bronx.  The UC told them that he would not learn the location of the house until the following morning.

d.    The UC told HERRERA and CIRRASQUILLO that the way the organization operates is that if he leaves the location with the cocaine, then he is responsible for it.  Therefore, the robbery had to take place at the location where the drugs were stored.  The UC told HERRERA and CIRRASQUILLO that there would be three individuals inside the house, and that at least one of the individuals would be armed.

e.    HERRERA and CIRRASQUILLO discussed how the

3

robbery would take place.  The defendants told the UC that they
would enter the location, order everyone to the ground, and tie
up everyone.  They also told the UC that they would tie him up as
well, so that it did not look suspicious.  In addition,
CIRRASQUILLO told the UC that he would take the UC's chain and
watch to protect the UC.  When describing the way they would
enter the house, CIRRASQUILLO made a motion with his hands
appearing to be carrying a firearm.  HERRERA and CIRRASQUILLO
also asked the UC about the neighborhood where the robbery would
take place.

    f.   The UC asked HERRERA and CIRRASQUILLO how
many other individuals were going to participate in the robbery.
CIRRASQUILLO responded that he was going to recruit two or three
other individuals.

    g.   The UC discussed with HERRERA and
CIRRASQUILLO how they would divide the proceeds of the robbery.
They agreed that the UC would get 10 kilograms of cocaine, and
the other participants would receive the rest.  They agreed that
if there was more than 30 kilograms of cocaine, they would
further negotiate a different split.

    h.   The UC told HERRERA and CIRRASQUILLO to have
everyone available the following day by 12:00 p.m., and told them
that he would call HERRERA at approximately 2:00 p.m. and tell
them where to meet in the Bronx.  The UC told the defendants that
he would receive a telephone call at approximately 3:00 p.m. with
the location of the cocaine.  He also told them that, prior to
doing the robbery, he was going to provide them with a van for
them to use during the robbery.  The UC told HERRERA and
CIRRASQUILLO that they should return the van, with his share of
the cocaine, to the same location after the robbery.

    8.   Following the meeting at the hotel on June 26,
2007, JUAN HERRERA, a/k/a "Flaco," a/k/a "Santos Rodriguez," the
defendant, called the UC at approximately 9:30 p.m.  This
telephone call was recorded.  During the course of this
conversation, HERRERA told the UC that he had discussed the plan
with his people, and that HERRERA believed that the UC's share of
the cocaine was excessive.  HERRERA said, in part and in
substance, that the participants in the robbery would only
receive 5 kilograms of cocaine, and that is not enough.  The UC
told HERRERA that he would discuss the situation with everyone
the following day.

    9.   On June 27, 2007, at approximately 1:00 p.m. JUAN
HERRERA, a/k/a "Flaco," a/k/a "Santos Rodriguez," the defendant,
called the UC and told him that he had all of his people ready to

4

go.  The UC told HERRERA that he would call them later that day
when he was in the Bronx.  At approximately 2:30 p.m., the UC
contacted HERRERA and told him to meet him at a gas station in
the Bronx.  The UC gave the address of the gas station to
HERRERA.  Approximately fifteen minutes later, HERRERA arrived at
the gas station on foot.  The UC asked where the rest of the
group was, and HERRERA stated that they were driving around, and
that they would not agree to meet the UC.  The UC told HERRERA
that he had to meet the other individuals who were going to do
the robbery, so they could see what the UC looked like.  After
discussing this for approximately fifteen minutes, HERRERA said
the he did not want to do the robbery.

        10.    Thereafter, the CI placed a telephone call to JUAN
HERRERA, a/k/a "Flaco," a/k/a "Santos Rodriguez," the defendant,
to reassure HERRERA that the UC could be trusted.  Following that
conversation, HERRERA called the UC and told him that he, and the
other individuals, would come to the gas station approximately
five minutes later.

        11.    Approximately fifteen minutes later, JUAN HERRERA,
a/k/a "Flaco," a/k/a "Santos Rodriguez," the defendant, arrived
back at the gas station on foot.  HERRERA got into the car with
the UC, and told the UC that they were ready to go pick up his
people.  The UC drove HERRERA approximately one or two blocks,
and HERRERA got out of the car, and into a vehicle driven by JOSE
CIRRASQUILLO, a/k/a "Tio," the defendant.  CIRRASQUILLO pulled
his vehicle over to the side of the road, and instructed the UC
to wait.  Approximately two minutes later, CIRRASQUILLO pulled
into the street, and the UC observed a Range Rover pull in behind
him.  The UC proceeded to a pre-determined location inside a
storage facility, and was followed by the vehicle driven by
CIRRASQUILLO and the Range Rover.

        12.    When the UC arrived at the storage facility, the
two vehicles parked outside the facility.  Eventually, the UC
drove his car back outside the storage facility, and picked up
JUAN HERRERA, a/k/a "Flaco," a/k/a "Santos Rodriguez," the
defendant, and drove him to storage unit where the van was
stored.  JOSE CIRRASQUILLO, a/k/a "Tio," remained outside the
storage facility.  Two of the other individuals in the Range
Rover, later identified as DEMI ABRIHAM, a/k/a "300," and BRYANT
DE LOS SANTOS, the defendants, also remained in their vehicle.
Thereafter, the defendants were arrested.

        13.    Following the defendants' arrests, they were taken
to ATF offices.  After taking BRYANT DE LOS SANTOS, the
defendant, to the ATF offices, he was read and waived his Miranda
rights.  He stated, in substance and in part, that he was

contacted by JOSE CIRRASQUILLO, a/k/a "Tio," the defendant, on June 26, 2007, who told him that he knew an individual who knew where there was 25 to 30 kilograms of cocaine. According to DE LOS SANTOS, CIRRASQUILLO told him that they were going to steal the cocaine. DE LOS SANTOS also stated that CIRRASQUILLO asked him if he was interested, and also if he knew of any others who were interested in participating in the robbery. DE LOS SANTOS also stated that later on June 26, 2007, he went to the home of DEMI ABRIHAM, a/k/a "300," and told DEMI that CIRRASQUILLO is planning a robbery of 25 to 30 kilograms of cocaine, and asked DEMI if he wanted to participate. DE LOS SANTOS also stated, in part and in substance, that his and DEMI's job during the robbery was to be a look out and to drive the getaway car.

14. After taking DEMI ABRIHAM, a/k/a "300," the defendant, to the ATF offices, he was read and waived his <u>Miranda</u> rights. He stated, in substance and in part, that BRYANT DE LOS SANTOS, the defendant, contacted him on June 26, 2007, and asked him if he wanted to participate in a robbery of 25 to 30 kilograms of cocaine, and ABRIHAM agreed to participate in the robbery. ABRIHAM also stated that he knows that JOSE CIRRASQUILLO, a/k/a "Tio," the defendant, often robs drug dealers.

WHEREFORE, deponent respectfully requests that JUAN HERRERA, a/k/a "Flaco," a/k/a "Santos Rodriguez," JOSE CIRRASQUILLO, a/k/a "Tio," DEMI ABRIHAM, a/k/a "300," BRYANT DE LOS SANTOS, the defendants, be imprisoned or bailed, as the case may be.

_____
PETER SHANHAI
Detective, New York City
Police Department


Sworn to before me this JUN 2 7 2007
__ day of June, 2007.


_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK
GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA             :

     - v. -                                  :

LORENZO RODRIGUEZ,                   :
  a/k/a "Flaco,"
JOSE CIRRASQUILLO,                   :
  a/k/a "Tio,"
DEMI ABRIHAM,                        :
  a/k/a "300,"
BRYANT DE LOS SANTOS,                :
PEDRO CABRERA,
  a/k/a "Pete,"                         :

            Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**INDICTMENT**

S1 07 Cr. 699 (HB)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: OCT 0 3 2007

## COUNT ONE

     The Grand Jury charges:

     1.    From in or about June 7, 2007, up through and
including September 2007, in the Southern District of New York
and elsewhere, LORENZO RODRIGUEZ, a/k/a "Flaco," JOSE
CIRRASQUILLO, a/k/a "Tio," DEMI ABRAHAM, a/k/a "300," BRYANT DE
LOS SANTOS, and PEDRO CABRERA, a/k/a "Pete," the defendants, and
others known and unknown, unlawfully, willfully, and knowingly
conspired to commit robbery, as that term is defined in Title 18,
United States Code, Section 1951(b)(1), to wit, the defendants,
and others known and unknown, conspired to rob a cocaine dealer
of approximately 25 kilograms of cocaine in the Bronx, and would
thereby have obstructed, delayed and affected commerce and the

movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3).

(Title 18, United States Code, Sections 1951 and 2.)

### COUNT TWO

The Grand Jury further charges:

2.    From in or about June 7, 2007, up through and including September 2007, in the Southern District of New York and elsewhere, LORENZO RODRIGUEZ, a/k/a "Flaco," JOSE CIRRASQUILLO, a/k/a "Tio," DEMI ABRAHAM, a/k/a "300," BRYANT DE LOS SANTOS, PEDRO CABRERA, a/k/a "Pete," the defendants, and others known and unknown, unlawfully, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

3.    It was a part and an object of said conspiracy that LORENZO RODRIGUEZ, a/k/a "Flaco," JOSE CIRRASQUILLO, a/k/a "Tio," DEMI ABRAHAM, a/k/a "300," BRYANT DE LOS SANTOS, and PEDRO CABRERA, a/k/a "Pete," the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, to wit, 5 kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Sections 812, 841(a)(1), and 841(b)(1)(A) of Title 21, United States Code.

### Overt Acts

4.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others,

2

were committed in the Southern District of New York and
elsewhere:

        a.   On or about June 26, 2007, in Queens, New
York, LORENZO RODRIGUEZ, a/k/a "Flaco," JOSE CIRRASQUILLO, a/k/a
"Tio," the defendants, met at a hotel and discussed a plan to rob
individuals they believed to be in possession of approximately 25
to 30 kilograms of cocaine.

        b.   On or about June 27, 2007, in Bronx, New
York, LORENZO RODRIGUEZ, a/k/a "Flaco," JOSE CIRRASQUILLO, a/k/a
"Tio," DEMI ABRAHAM, a/k/a "300," BRYANT DE LOS SANTOS, and PEDRO
CABRERA, a/k/a "Pete," the defendants, traveled to the vicinity
of a storage facility in Bronx, New York, to meet with other
individuals to go and rob individuals they believed to be in
possession of approximately 25 to 30 kilograms of cocaine.

        (Title 21, United States Code, Section 846.)

FOREPERSON

MICHAEL J. GARCIA
United States Attorney

3

Form No. USA-33s-274 (Ed. 9-25-58)

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

#### UNITED STATES OF AMERICA

- v. -

**LORENZO RODRIGUEZ,**
**a/k/a "Flaco,"**
**JOSE CIRRASQUILLO,**
**a/k/a "Tio,"**
**DEMI ABRIHAM,**
**a/k/a "300,"**
**BRYANT DE LOS SANTOS,**
**PEDRO CABRERA,**
**a/k/a "Pete,"**

**Defendants.**

#### INDICTMENT

S1 07 Cr. 699 (HB)

(18 U.S.C. §§ 2, 1951,
21 U.S.C. § 846.)

MICHAEL J. GARCIA
United States Attorney.

**A TRUE BILL**

*Dennise Suarez-Peña*
Foreperson.

16|03|07
Filed Ind.
Ellis, J.

# Exhibit C

DRAFT

| | | |
|---|---|---|
| CASE: | U.S. v. RODRÍGUEZ | |
| CALL NO.: | E-000008 | |
| DATE: | JUNE 26, 2007 | |
| TIME: | 9:30 P.M. | |
| TEL. NO.: | (718) 679-1909 | |
| PARTICIPANTS: | FLACO LNU<br>UNDERCOVER | |
| ABBREVIATIONS: | [U/I] = Unintelligible in English<br>[I/I] = Unintelligible in Spanish<br>[PH] = Phonetic Spelling | |

| | **ENGLISH TRANSLATION** | **ORIGINAL LANGUAGE** |
|---|---|---|
| FLACO LNU | Hello. | Hello. |
| UNDERCOVER | What's going on, partner. | Dime, *partner*. |
| FLACO LNU | What's going on? Are you eating? | ¿Qué es lo que hay? ¿Estás comiendo? |
| UNDERCOVER | No, I'm here with my...with my broad. She's inside the store. What's going on, brother? | No, estoy aquí con la... con la "jevita". Está adentro en la tienda. ¿Qué pasó, *brother?* |
| FLACO LNU | Well, I'm calling you to tell you that I have everything set up, but there's a small problem. | No, yo te estoy llamando, yo tengo todo "seteado", pero hay un pequeño problemita. |
| UNDERCOVER | What happened? | ¿Qué pasó? |
| FLACO LNU | These guys are not to happy with the...with the...with the way we're going to split it. I don't | Estos muchachos no están muy de acuerdo con... con la... con la repartidera. Yo no sé. |

1

**DRAFT**

|  |  |  |
|---|---|---|
|  | know. What do you think? | ¿Qué tú crees? |
| UNDERCOVER | What happened now? | ¿El qué *now*? |
| FLACO LNU | With the...with...with...with the split. | Con la... con... con... con la repartidera. |
| UNDERCOVER | What? I don't understand... | ¿Cómo? Que yo no entien... |
|  | [Voices overlap] | [Interposición de voces] |
| FLACO LNU | They're saying that what we're going to get is very...very little on this end. Because at least five or six of us have to come along. You understand? Because the thing, you know, is very, very tight. | Ellos dicen que vamos a tocar muy... muy poco de este lado. Porque tenemos que ir por lo menos cinco o seis. ¿Tú entiendes? Porque la cosa, tú sabes, es apretadísima. |
| UNDERCOVER | Right. Are you talking about fire? | Ajá. ¿Tú estás hablando de fuego? |
| FLACO LNU | No, no, no, no, no. Really...well, we're going to come, you know, because you know that over there...you know what's there. | No, no, no, no, no. Realmente... no, vamos a ir, tú sabes, porque tú sabes que allá... tú sabes lo que hay. |
| UNDERCOVER | Right. So what's the problem then. | Ajá. ¿Qué problema entonces? |
| FLACO LNU | I'm saying that they feel that if they give you...if...that if you take ten pairs of pants it's too much. | Que ellos dicen que si te dan... si... si tú coges diez pantalones es demasiado. |
| UNDERCOVER | Why? | ¿Por qué? |
|  | [Voices overlap] | [Interposición de voces] |
| FLACO LNU | They say why don't you take just eight, at least that. I spoke to them, you understand? | Que porque tú no coges ocho por lo menos. Yo hablé con ellos, ¿tú entiendes? |

2

**DRAFT**

| UNDERCOVER | Well, tomorrow we'll talk about it. You bring your people and tomorrow we'll talk about it and... and we'll reach an agreement. | Bueno, mañana hablamos de eso entonces. Tú traes tú gente y mañana hablamos y... y nos ponemos de acuerdo. |
|---|---|---|
| FLACO LNU | Well all right. No problem. | Pues está todo. No hay problema. |
| UNDERCOVER | Yes, so then I'll call you tomorrow like at...let's say at 1:30. Let me tell you, I'll be ready since 12:00, but I'm going to call you like at 1:30, around there, brother. | Sí, yo te llamo entonces mañana como... vamos a decir una y media. Estoy listo ya desde la doce te dije, pero te voy a llamar como a la una y media por ahí, *brother.* |
| FLACO LNU | All set. No problem. | Está todo. No hay problema. |
| UNDERCOVER | O.K. I'll call you. | O.K. Yo te llamo. |
| FLACO LNU | O.K. | O.K. |
| UNDERCOVER | Chill. | Tranquilo. |
| | [END OF CALL] | [FIN DE LA LLAMADA] |
| AGENT | | *The date is Tuesday, June 26, 2007. The time's approximately 9:30 P.M. Previous telephone call was placed to target Flaco, returning a missed call from his cell phone, phone number of (718) 679-1909.* |